MARSHALL M. STRONG, *Appellant*

*vs.*

JAMES CATTON, *Appellee.*

APPEAL FROM THE CIRCUIT COURT OF WALWORTH COUNTY.

An appeal lies from the order of the Circuit Court, confirming or setting aside a report of sale in a foreclosure suit.

A purchaser at a foreclosure sale purchases subject to the ultimate determination of the court upon the sale.

The court retains jurisdiction upon the whole subject matter of a foreclosure suit until the final order of confirmation. Even after the confirmation a sale may be set aside upon adequate cause shown.

Mere inadequacy of price, is not of itself a sufficient cause for setting aside a sale fairly made.

But when a party has been led to believe that the sale would be postponed, through the representations of the complainant, though not made with a design of misleading him, yet relying upon such representations, he has failed to provide for the payment of the sum due, without negligence, and the premises have been sold for a grossly inadequate price, the sale will be set aside, and a re-sale ordered, on indemnity to the purchaser being made.

On the 23d day of September, 1848, John Martin filed his bill in the Circuit Court of Walworth county, by J. N. Stoddard, his solicitor, against David S. Wells, Grove Adams and James A. Stevens, for the foreclosure of a mortgage executed by the defendants to the complainants, to secure the payment of the purchase-money of the premises mortgaged, and conditioned for the payment of $2,300, and interest at seven per cent. per annum, payable annually, on the first day of September in each year; and the principal payable, $300 the first day of April, 1848, $500 the first of September, 1850, and $500 thereafter annually, until the whole amount should be paid. The defendants

appeared by C. P. Barnes, Esq., their solicitor, and answered.

On the 7th day of December, 1850, the usual decree for the sale of the mortgaged premises was made and entered by the court. Subsequent to the decree, and before the sale of the premises, the amount found and decreed to be due on said mortgage, with interest and costs, was paid.

On the 1st day of September, 1851, an instalment of $500, and interest for one year on $1,500, fell due, whereupon the complainant filed his petition, and obtained the usual and further decree for the sale of the mortgaged premises ; and in pursuance of the said last mentioned decree, the sheriff of Walworth county on the 10th day of July, 1852, at the court house in the village of Elkhorn, sold at public vendue the mortgaged premises to Marshall M. Strong, for the sum of $1,776.86, the sheriff having given due and proper notice of such sale. Due report of the sale was made.

At the opening of the court the 6th day of December, 1852, Marshall M. Strong, the purchaser, filed a motion for the confirmation of the report of sale, and one James Catton, then and there caused to be filed his petition, supported by affidavits, praying that said sale might be set aside.

The petition of Catton set forth, that after the execution of the mortgage, and before the said sale, he purchased and became the owner of the premises, and that the sale ought to be set aside for the following reasons :

1. Because it does not appear that the court ordered and decreed the whole of the mortgaged premises to be sold to pay the mortgage debt.

2. It does not appear by the report of sale, that

said premises could not have been sold in parcels, to pay the amount due on said mortgage.

3. It appears that the petitioner did not attend and bid at said sale, in consequence of an impression received from the complainant, that he would postpone the sale; and also because the complainant did agree to postpone said sale for ten days.

4. Because said mortgaged premises were sold for less than one-third part of the actual value thereof.

5. Because it appears, that in case a re-sale thereof is ordered by the court, the said premises will bring, and can be sold for, five thousand dollars.

Accompanying the petition, is the affidavit of Catton, stating that he purchased the premises of Wells, Adams & Stevens, the 7th January, 1849, immediately went into possession and has continued in possession ever since, subject to said mortgage; that previous to the sale he was engaged in raising money to pay up the amount due on said decree; that finding it inconvenient to raise the same, he applied to Martin, the complainant, to have the sale postponed for a short time, for the purpose of enabling him the better to raise the money; that Martin assured him, that he was willing to do any thing in that respect that would be for his, Catton's, interest; that he had different conversations with Martin, and in every one up to the time of sale, he assured him, that he would consult his interest as to the time of sale; that in consequence of such assurance, he ceased his efforts to raise the amount due, and did not raise it as otherwise he might and would have done; that previous to said assurance from Martin, he had made arrangements for a part of the money, and could have raised the whole

of it, had it not been for such assurances; that from the remark of Martin he was led to believe, and did believe, the sale would be postponed; that he had made arrangements for the whole of the money, and would have raised the whole sum within the ten days.

That previous to the sale, Strong, the purchaser, was informed of the assurances given by Martin; and that Strong then offered him, Catton, five hundred dollars if he would not insist upon such adjournment, and would quit claim his interest in the premises to the purchaser at the sale, and give up possession of the property; which offer was refused.

That he did not attend the sale, but procured Nelson R. Norton to attend on his behalf, and procure the sale to be postponed ten days or longer; that Norton did attend and endeavor to get the sale adjourned, but Martin utterly refused to consent to any adjournment, and insisted that the sale should then take place, assigning as a reason that he did not believe a postponement would benefit Catton, and that he would get all the money due and to become due by having the sale then made, and should have no more trouble in regard to it.

That the premises were worth, at the time of the sale, $6,000, and that, one year before, he was offered $5,500, which he refused; that he had paid to the complainants $1,100 on said mortgage, and had expended in repairs, since his purchase, about $1,500.

Also, the affidavit of Nelson R. Norton, stating that the premises, at the time of the sale, were worth about $5,000, and were now worth that sum; that during the fore part of the summer of 1852, at the request of Catton, he had several conversations with Martin

as to the said sale, and having the sale postponed, to enable Catton to raise the money due on the decree without having the premises sold ; that in all of them he expressed a willingness to have the sale adjourned, if it would accommodate Catton, but that he would not do it to benefit the defendants ; that the result of these conversations was communicated to Catton, and he believes Catton relied upon them, and did not raise the money as he otherwise would have done; that at the request of Catton he attended the sale, and requested Martin to have the sale postponed for ten days, but Martin refused to adjourn, for any time, alleging as a reason that he did not believe the adjournment was asked for to benefit Catton, but other persons.

Mr. Strong, the purchaser, filed his motion to dismiss the petition, for the following reasons :

1. The petition was not filed in due time, nearly six months having elapsed since the sale, and no motion filed or written notice thereof given until Dec. 6, 1852.

2. The petition is founded on ex-parte affidavits.

3. The petition does not state any facts and circumstances on which it is founded.

4. It shows no offer to indemnify or reimburse the purchaser, and no higher bid for the premises.

The motion to confirm the report of sale, the petition of Catton, and the motion to dismiss the petition, were heard at the same time.

On the hearing, the counsel for Catton presented and offered to read cumulative affidavits, made by Catton, John Aiken and Thomas W. Miller, which stated that the affiants knew the premises, and estimated the value thereof variously, from $3,500 to $6,000. Miller stated that the premises were worth $3,000,

and that he would bid and pay that amount therefor; and that he was responsible and able to pay for the same. The affidavit of Miller was admitted; the other two were rejected.

On the part of Mr. Strong, the purchaser, a number, of affidavits were read; among the number, that of John Martin, the complainant, who stated that he never gave Catton any promise or encouragement that the sale would be postponed; that he never thought that Catton had any real interest in the premises; that he had frequently said so to Catton and his friends, and among them, to Nelson R. Norton, and that he and Norton agreed on that point; that Friday evening, before the sale, he left Burlington with Marshall M. Strong to attend the sale; that Catton was present when they left, and that nothing was said or intimated about any adjournment of said sale; that delays and postponements have been from time to time granted, but that no encouragement was given on that occasion.

Also the affidavit of Albert G. Cole and others, as follows:

*Albert G. Cole*, of Burlington, in said county, being duly sworn, says, at the time John Martin, the above named complainant went east in 1851, he left a power of attorney, appointing this deponent his attorney to act for him in reference to the premises described in the bill in the above entitled suit; that this power of attorney was left because said defendant Wells and James Catton talked of selling said premises to one Samuel C. Vaughn; and this deponent was instructed to postpone the chancery sale, to give said Wells and Catton an opportunity to sell as aforesaid; that some time in January last, this deponent wrote said Martin that there was no probability of any sale being made to said Vaughn; and that said Martin replied, requesting this deponent to have the chancery sale take place about the first day

of May last ; that this deponent communicated to said Catton what had been written by said Martin ; and that said Catton importuned for delay, promising to pay up the amount of the decree ; that said Martin returned about the first day of May last, and blamed this deponent because said chancery sale had not been advertised ; that this deponent then urged said Catton to pay, and told him how much said Martin complained of him for not advertising, and that he was so much displeased, that this deponent did not know but that he would take the business out of this deponent's hands, and have it put through ; that said Martin resided at Burlington from the time the sale was advertised, until it took place ; and this deponent saw him almost every day, and never knew that he entertained at all the idea of extending said sale ; but on the contrary, this deponent knows that said Martin was waiting here expressly to have said sale take place, that he might return to the east ; and that as soon as it did take place, said Martin did return to the east ; that this deponent heard said Catton talk with said Martin several times about having said sale postponed, after said sale had been advertised, and before it took place ; and that said Martin uniformly told said Catton, that if it would benefit him, he would be willing to do any thing that would benefit him, but that he did not see that it would benefit him ; and that he never, in any of these conversations, gave said Catton any encouragement for a postponement of said sale ; that during said time, said Catton frequently asked this deponent to ask said Martin for a postponement ; and that this deponent uniformly told said Catton that it would do no good, for that said Martin's mind was set upon a sale ; that this deponent, in pursuance of said Catton's request, did ask said Martin for a postponement for said Catton ; and that said Martin uniformly denied it ; and this deponent conveyed said Martin's answer to said Catton.

And this deponent further says, that about a week or ten days before said sale, said Catton again applied to this deponent, and wished him to see the said Martin, for the purpose of having it definitely settled whether there could be a post-

ponement of said sale or not; that this deponent immediately saw said Martin, and made known to him said Catton's wishes; that said Martin replied, unqualifiedly, that he could not postpone it; which reply this deponent immediately conveyed to said Catton; that at the time said Catton made this application, he said he wanted to know, for if the sale could not be postponed he must go to the Lake and get the money; and this deponent further says, that said Catton was perfectly aware all this time, that said Martin was awaiting the result of said sale to go east.

And this deponent further says, that on the morning of the sale, said Catton told this deponent to say to said Martin, if he would postpone said sale he would pay him one hundred dollars; that this deponent mentioned it to said Martin, and he declined.

And this deponent further says, that from the time said sale was advertised, until it took place, said Catton did not cease to make efforts to raise the money due upon the decree, and frequently said that he had got it arranged, so that he would have the money; and this deponent's impression is, that he so said on the morning of the sale.

And this deponent further says, that during all this time he never saw any prospect of said Catton's raising said money, and could not imagine how it could be raised; that it was a subject of frequent conversation, and the difficulty in raising the money was, that the property was so heavily incumbered that no one would make a loan upon it.

*Nelson R. Norton*, of said county, being duly sworn, says that when he gave his former affidavit in the above cause, and stated therein that the premises sold on the decree in the above entitled cause were worth $5,000, and that he would give that for them, he meant thereby that he would be willing to give that amount for them if he wished to purchase them; but this deponent says, that he is not prepared to purchase the same, and that he does not wish to.

And this deponent further says, that during the different conversations he held with said Martin, relative to extending the sale, said Martin always told this deponent, he would be willing to extend the sale if it would accommo-

date Catton, but always qualified it by saying that he did not believe it would accommodate Catton; and that he would not accommodate Wells, Adams and Stevéns.

And this deponent further says, that if he stated in his former affidavit, that he believed said Catton ceased his efforts to raise money on account of any assurances from Martin, that this deponent did not intend so to state; and that this deponent believes that said Catton did not cease in his efforts to raise money up to the day of said sale.

*Marshall M. Strong,* of the city and county of Racine, in said state, being duly sworn, says that for the last four years he has been one of the firm of Strong and Fuller, attorneys at law in said city; that some time in the latter part of 1849, or the fore part of 1850, Messrs. Herbert, Olmsted & Co., merchants in New York city, sent to said firm, for collection, a large demand against the defendants in the above entitled cause.

And this deponent further says, that said defendants had, shortly before that time, been merchants at said Burlington, under the name and style of Wells, Adams and Stevens; that they commenced business with but little capital; that with the avails of their goods they built the mill situate upon the premises in question; that in the fall of 1849 they purchased a large stock of goods, and very shortly after conveyed away all their property.

And this deponent further says, that said Wells was the principal man in said firm of Wells, Adams and Stevens; and that James Catton, who has petitioned to have the sale of the premises made upon the decree in said cause set aside, was an intimate, personal friend of said Wells, and also of said Adams and Stevens; and that said defendants conveyed the premises in question to said Catton by deed, dated 7th January, 1850, subject to said complainant's mortgage, which said Catton assumed to pay, and took back a mortgage from said Catton for $5,000, payable in five equal annual payments; the first one to be made on the first day of October, 1851, and the others annually thereafter.

And this deponent further says, that said Strong & Fuller

commenced suit by attachment on said demand against said defendant, and attached the premises in question, and no other property ; that on the 29th day of October, 1850, they obtained a judgment on said demand for $2,452.80, and filed a transcript thereof in the office of the clerk of Circuit Court of Walworth county, on the 24th day of January, 1841, which was the only judgment at that time in said office, against said defendants ; and said judgment still remains entirely unpaid and unsatisfied.

And this deponent further says, that said Strong & Fuller immediately informed their said clients of the situation of said property, and that the mortgage given to John Martin, was in the process of foreclosure, and that they had better bid at the sale and contest the validity of the sale of said premises to said Catton ; that said clients approved of said advice, and authorized said Strong & Fuller to bid, and draw upon them for the money.

And this deponent further says, that in pursuance of said authority, he attended at Elkhorn, on the day advertised for the sale of said premises, on the decree in the above entitled cause, in the spring of 1851, at which time the sale was either adjourned, or the amount then due on the decree was paid.

And this deponent further says, that about two weeks before the sale in question, this deponent as attorney for said Herbert, Olmsted & Co., made a journey to Burlington to ascertain the situation of this property, and whether the sale would probably take place ; that while there he made known to Nelson R. Norton, the confidential friend of said Catton, the position this deponent occupied in the matter, and requested him to see said Catton and ascertain whether some arrangement could not be made by which said Herbert, Olmstead & Co., could get the whole premises.

And this deponent further says, that said sale took place on Saturday, the 10th day of July last ; that on the Wednesday or Thuursday before said sale, said Norton came into the office of this deponent, at Racine, and told this deponent that he had come in expressly to make an arrange-

ment with this deponent as to said premises, as the agent of said Catton, and with full power to settle it in any manner he thought fit; and that he had had long conversations with Catton, and Catton began to think that Wells would not play true, and had concluded he had better make no more payments on the mortgage ; and said Norton told this deponent, that whatever this deponent paid Catton, must be paid in cash down, as he was greatly in want of it to buy wool to carry on his factory ; that this deponent told said Norton that he should, in no event, pay Catton over $500, as he had concluded not to pay over $2,500 for the whole property ; but this deponent declined making any arrangement then, but promised to go out to Burlington early on Friday, the day before the sale, and see Norton and Catton there ; that this deponent did so, and spent some four or five hours at Burlington, and had a long conversation with said Norton and Catton upon this subject.

And this deponent further says, that at said conversation said Catton recognized the acts of his said agent, Norton ; that said Catton then told this deponent that he had not paid any part of the $5,0000 mortgage given by him to said defendants ; and that he did not know where the said mortgage, or the notes accompanying the same were, although he had tried earnestly to ascertain.

And this deponent further says, that said Catton was willing to take $500, and do what he could to give the whole title to the premises to this deponent ; but that this deponent declined, on account of said outstanding mortgage ; and this deponent expressly says, that said negotiation was broken off by this deponent, and not by said Catton.

And this deponent further says, that in his said several conversations with Norton, said Norton informed this deponent that said Catton had been earnestly trying to get the money due by the decree, and could not get it, and he did not see how he could get it ; and that he had advised said Catton to employ this deponent as attorney, to get rid of said $5,000 mortgage ; and said Norton inquired of this

deponent, in what manner that object could be accomplished.

And this deponent further says, that he and the said Martin started away from the public house at Burlington, about 6 o'clock P. M., on said Friday, in the presence of the said Catton and Norton, with the avowed intent of attending said sale ; and that this deponent had no idea that any adjournment of said sale was intended or expected by any one.

And this deponent says, that he never, at any time after he heard said sale was advertised, supposed that it would be postponed, or believed that Catton thought there was any chance of having it postponed, or that said Martin had given any encouragement to that effect, nor does he think so now ; that said Catton was greatly disappointed when this deponent declined to enter into an arrangement with him, and might have threatened to try to get an adjournment, but this deponent has no recollection of his saying anything about it.

And this deponent says, that he spent the forenoon of the day of sale in examining the title ; that he hired the register of deeds to make an abstract therefor ; that he ascertained that the taxes on said premises, for 1851, were unpaid, and amounted to about $50 ; that he bid off said premises, at $1,776 and 86 cents, which was the amount owing to said Martin, together with the costs ; that he took a sheriff's deed of the same, and had it recorded ; that he paid the whole amount of his said bill in cash down, to the sheriff ; that he quit-claimed, gratuitously, three small lots to three different persons, which had been purchased of said Wells, Adams and Stevens while they had title, and paid for to them ; that he immediately had the mill on said premises insured for one year, and paid $50 therefor ; that he immediately informed his clients of the purchase, and that they replied that one of them would immediately make a journey expressly to see the property, and to decide what to do with it ; and that shortly thereafter one of said firm, to wit, John Olmsted, came on here and visited said property, and said

that he came expressly for that purpose ; that this deponent quit-claimed said premises to said John Olmsted, conveying to one person alone for the convenience in taking a power of attorney back ; that he drew up a power of attorney from said John Olmsted to said Strong & Fuller, which had been executed and delivered ; that he employed a competent person to examine the dam and mill on said premises, to ascertain in what repair they were in.

And this deponent further says, that on his return home from said sale he stopped at the public house at Burlington, and saw said Catton there, who then told this deponent that he had tried to telegraph to Martin to have the said sale postponed, but that he could not got a communication through to Elkhorn.

And this deponent further says, that some weeks after said sale, and perhaps months, said Catton came into the office of this deponent, and asked him what he was going to give him for said premises ; and that this deponent replied that he could not give him anything ; whereupon said Catton left, and said he should try to get the sale set aside, which this deponent regarded as a mere idle threat.

And this deponent says, that said defendants have all gone to California, and are each and all insolvent ; and that he is informed by several business men of Burlington, who have good opportunities to know, that said Catton is considered insolvent, without taking into the account said $5,000 mortgage ; and that this deponent verily believes that such is the case.

And this deponent further says, that he has no notice of the petition of said Catton, except as above stated, until the sixth instant, when the same was filed in court ; that no offer has ever been made to this deponent to reimburse him the amount bid by him, as aforesaid, and the other amounts so expended by him.

And this deponent says, that said Catton told him at said conversation on said Friday, that said mill was bringing him $40 per month, and had done so for the past year ; but

previous thereto that it had been a great bill of expense to him, over and above the income.

MARSHALL M. STRONG.

Subscribed and sworn before me this }
      9th day of December, 1852. }

W. H. Pettit, *Clerk.*

There were other facts and circumstances adduced, all of which are sufficiently detailed in the opinion of the court. It was deemed advisable to state quite fully the matters set forth in the affidavits on which the motions and petition were based, as this is a new question in this court, one which may be likely to arise frequently in practice, and hence of importance to the profession.

After the hearing, the court below, ordered the sale to be set aside, and a re-sale of the premises ; and that the said Catton pay to the purchaser $1,776.86, the amount bid at the sale, with interest thereon, within ten days, and that he pay to the purchaser his costs and expenses in making the purchase, after the same shall be ascertained by the court ; and a reference was ordered to ascertain the same.

From this order the purchaser, Marshall M. Strong, appealed to this court.

*F. S. Lovell*, for the appellant.

I. The court below should have dismisssed the petition of the respondent on motion of the appellant.

1. Because the petition was not filed in due time. Five months intervened between the day of sale, and the filing of the petition. No notice thereof given until the 6th day of May, 1852, the day the petition was filed.

2. No offer to reimburse or indemnify the purchas-

er ; the amount bid by him at the sale, and his expen-
ses attending the same were not paid into court, nor
tendered to the purchaser.

3. No higher bid was offered by any person ; no
offer or proposition made to bid at a re-sale of the
premises, was, or is, obligatory or binding upon the
person making it. The amount of the advance bid
should be paid into court, or such bid as will be bind-
ing on the party making it, should be made, before
the court orders a re-sale. 2 *Danl. Ch. Pr.*, 1471–2 ;
6 *Ves. jr.*, 512, *anon.*

II. A sale cannot be set aside, or biddings opened
on any other grounds, than surprise, accident or fraud,
or some other grounds of purely equitable relief.
*Gordon vs. Sims*, 2 *McCord's Ch. R.* 158 ; *Duncan
vs. Dodd*, 2 *Paige*, 99 ; *Thompson vs. S. & M. Mount*,
1 *Barb.* 607 ; *Collins vs. Whipple*, 13 *Wend.* 224 ;
*Farnham vs. Cotton*, 1 *Clark Ch. Rep.* 35; *id.* 101; *id.*
475 ; *Mott vs. Wakeley*, 3 *Edwards*, 590.

Neither surprise, accident, fraud or any equitable
grounds for relief are shown by the affidavits in this
case. If the respondent's property was sacrificed, it
was occasioned by his own negligence.

III. Inadequacy of price is not of itself sufficient to
deprive a bona fide purchaser at a master's sale, of the
benefit of his purchase. *Billington vs. Forbes*, 10
*Paige*, 488 ; *Sugden on Vend.* 318–319. Inadequacy
of price unattended with other circumstances, is not
sufficient. 3 *John. Ch. Rep.* 291. If the property is
duly advertised, and fairly sold by the master, in the
usual manner, to a stranger to the suit, mere inadequa-
cy of price is not sufficient ground for depriving the
vendee of the benefit of his purchase ; unless the
inadequacy is so great as to be evidence of fraud or

unfairness in the sale. *Am. Ins. Co. vs. Oakley*, 9 *Paige* 261. Nor when the party was in a situation to understand and protect his rights, but has suffered the property to be sacrificed by his own negligence. 1 *Barb. Ch. R.* 608. When unfair means have not been employed to prevent competition at the sale, inadequacy of price, however great, is no ground for setting aside the sale. *Coleman vs. Bk. Hamburgh*, 2 *Strobhart Eq. Rep.* 285 ; 2 *Green*, 214; *id.* 460 ; 2 *McCord Ch.* 158 ; 11 *J. R.* 555 ; *Andrews vs. Scotton* ; 2 *Bland* 629–644.

IV. The English practice, subsequent to a decree of sale, in making sale, confirmation, giving deeds to purchasers, and opening sales, is not recognized in any court in this country. 2 *Danl. Ch. Pr.* 1449 *et seq.* and note 2, *p.* 1465 ; 14 *Ves.* 151.

V. The deed made by the sheriff is effective and conclusive. *R. S. chap.* 84, § 83 ; *Sess L.* 1852, *p.* 600, 602.

A court of equity is not authorized to interfere in such cases, except for the same reasons which would induce it to interfere in a contract between party and party.

*J. R. Doolittle*, for the appellee.

I. The practice on opening sales under decrees in chancery, is governed by no express rule or enactment, but falls under the general rule, requiring it to be conformed " to the usages of courts of chancery." *R. S.* 413, *chap.* 84, § 2.

II. It was the common practice of the English court of chancery to " open the biddings " and order a re-sale of the premises, upon an advance of ten per cent. over the biddings at the sale, at any time before

absolute confirmation. 2 *Danl. Ch. Pr.* 923, *et*

*seq.*

III. Until the sale is confirmed absolutely, the court of chancery considers it within its equitable power, and will go so far as to compel the assignee of the purchaser, before the sale is confirmed by the court, to pay into court the additional price, if any, for the benefit of the estate. It would be regarded as a deception upon the court, for the purchaser, before the sale is confirmed, to make any speculation, or receive any advance upon the property. 2 *Danl. Ch. Pr.* 922, *and cases there cited.*

IV. The practice of the court of chancery in New York has been regulated by specific rules, which authorize either party to enter an order of course to confirm the report of sale, unless cause be shown in eight days after the sale. *Rules* 110, 135. Here, no such order of confirmation is allowed to be entered until the next term of court. But until the sale is confirmed by order of the court, the sale is not regarded as complete, but subject to be opened for any good cause shown, for the benefit of the estate and its creditors. The purchaser, until the sale is confirmed, is subject to the jurisdiction of the court, and to any existing equities which would open the sale as between the parties. *Regna vs. Rea,* 2 *Paige,* 341 ; *Collier vs. Whipple,* 13 *Wend.* 226.

V. The cases of *Williamson vs. Dale,* (3 *John. Ch. R.* 290,) *Lansing vs. McPherson,* (*id.* 424,) *Duncan vs. Dodd,* (2 *Paige,* 99,) as well as the cases of *Collier vs. Whipple,* (13 *Wend.* 226,) *Trip. vs. Cook,* (26 *id.* 143,) while they show that the New York chancery practice is more strict upon the subject than the English, show at the same time conclusively, that the

court of chancery of that State has never refused to open a sale at any time before, or even after confirmation, when justice to the parties seemed to require it.

So, when " innocently misled and induced to believe that the sale would be postponed ;" when complainant promised " every reasonable indulgence," from which the defendant understood the sale would not go on ; when, after six months' delay, the court opened a sale upon an offer of fifty per cent. advance ; when there is a great inadequacy in price, that the sale cannot stand without doing injustice ; and a great variety of similar cases, the sales under decrees in chancery have been opened, and new sales ordered to take place, upon the simple principle declared by Lord Alvemly, when master of the rolls, as to what should control a court of equity, in the case of *Lord Cranstown vs. Johnston*, (3 *Vesey*, 170) : "I must for get the name of the court in which I sit, if I were to refuse to grant relief." See also, 8 *Paige*, 337 ; 9 *id.* 259 ; 10 *id.* 243 ; *id.* 487 ; 11 *id.* 201 ; *id.* 228 ; 4 *Sanf.* 582.

VI. This case is one of the strongest for equitable relief. The property, worth $5,000, was sold for $1,776, about one third its value.

The evidence is clear that Catton did expect the sale to be postponed, if he desired it. The decree makes ample indemnity to the purchaser, and should be sustained.

VII. It was a matter addressed to the discretion of the judge, and not subject to review by appeal. 9 *J. R.* 443 ; 10 *Pet.* 286 ; 1 *Comst.* 43 ; 16 *Wend.* 272 ; 18 *Wend.* 350 ; 2 *Comst.* 564 ; 3 *id.* 334.

*By the Court*, CRAWFORD J.—This is an appeal from a decretal order, setting aside a sale in a foreclosure proceeding, made by the judge of the first circuit, sitting as a Court of Chancery in the county of Walworth.

JUNE TERM,
1835.

Strong
vs.
Catton.

The question presented to us is, whether the case made by the petition of the appelle and the affidavits filed, as well by the petitioner as respondent, who is the appellant here, warranted the Circuit Court in setting the sale aside.

It appears, that in a certain proceeding in chancery, for the foreclosure of a mortgage, pending in the Circuit Court of Walworth county, in which cause one Martin was complainant, against Wells, Adams and Stevens, defendants, a decree and order of sale was made on the 7th day of October, 1851, to satisfy an instalment of the mortgage debt, namely : $500, and interest on $1,500, for one year. In pursuance of this decree, the sheriff of Walworth county, after the usual advertisement of the time and place of sale, disposed of the whole of the mortgaged premises at public auction, to the appellant, Marshall M. Strong, for the sum of $1,776.86, and thereupon executed and delivered to said Marshall M. Strong, a deed in the ordinary form used on such occasions.

This sale took place on the 10th day of July, 1852, and on the first day of the next succeeding term of the Circuit Court of Walworth county, the sheriff's report having been filed in due form, Mr. Strong, the purchaser, filed his motion for a confirmation of the report, and at the same time the appellee, James Catton, filed his petition for a resale of the premises, and that the sale made to Mr. Strong, might be set aside. Various affidavits were filed on the part, as

well of Mr. Catton as of Mr. Strong. To some of these, filed by Mr. Catton, an objection for want of notice was urged, but inasmuch as the petition for resale and the motion for confirmation of the former sale were heard simultaneously, we think all of the affidavits were properly before the court.

From the petition and affidavits presented on both sides, we find that after the execution of the mortgage to Martin, by Wells, Adams and Stevens, the latter sold and conveyed the premises, *subject to that mortgage*, to the petitioner, James Catton.

These premises consist of " certain land and a mill privilege," a grist mill and mill-dam, with about thirty acres of land, and are estimated to be worth from $3,500 to $6,000. Before the day of sale the petitioner had different conversations with the complainant upon the subject of postponing the sale, so as to enable the petitioner to procure the amount of money due upon the decree, and make payment in order to prevent a sale, and in all of these conversations, Martin assured the petitioner " that he would consult the interest" of Catton " as to the *time of sale.*"

The petitioner swears, that from the assurances thus given to him by Mr. Martin, " he was led to believe, and did believe, that said sale would be postponed," and in consequence thereof, ceased his efforts to obtain the money necessary to pay the amount due upon the decree. The affidavits filed by the petitioner, taken in connection with those of Mr. Martin, and his agent, Mr. Cole, satisfy us that the petitioner did, up to the very day of sale, rely upon a postponement thereof.

It is true that Mr. Martin denies that he ever promised to postpone the sale, and Mr. Cole states that Mar-

tin "uniformly denied" the request for a postponement, but we think that the expressions of Mr. Martin were, to some extent, calculated to induce the petitioner to rely upon a postponement. If, as the petitioner swears, he was assured by Mr. Martin that his interests would be consulted *as to the time of sale*, he may have too confidently depended upon the kindness of Mr. Martin. We cannot find that any intention to throw Catton off his guard, existed on the part of Mr. Martin ; but his expressions of regard for the interests of Mr. Catton were worse than meaningless, if we deny to them all influence on the mind and conduct of the latter. We are not to determine, at this time, whether caution and distrust of Mr. Martin's sincerity and friendship might not have required the petitioner to obtain the money and pay the amount due upon the decree, in order to make himself secure before the day of sale ; it is enough, that in the exercise of ordinary discretion, the assurances made and conveyed to him induced him to expect an indulgence ; and we cannot say that, under all the circumstances of the case, this expectation was unreasonable. At all events, it is apparent that he continued to believe that Mr. Martin would postpone the sale in furtherance of his interests ; and it is noticeable, that neither on the morning of the day of sale, nor on the evening preceding, did Mr. Martin inform the petitioner that the sale *must* take place.

We admit that the grounds upon which we assume that this is a case of *surprise*, are barely tenable; but when we reflect that the relation which Mr. Catton bore to the proceeding, his having purchased the premises subject to Mr. Martin's mortgage, and his anxiety to obtain the money and pay off the amount due upon

the decree, were known to Mr. Martin and to Mr. Strong, and when we find it stated in the affidavit of the petitioner (and we believe it is not denied) that he had before the sale paid to Martin on account of this mortgage debt, the sum of $1,150, besides having expended about $1,500 in repairing the property, we feel justified in pushing this case " to the utmost verge of an admissible interference," as was done by Chan-. cellor Kent in *Williamson vs. Dale*, (3 *John. Ch. R* 290.) Certainly, in this case, as in the one referred to, the surprise is not of the most striking kind.

The importunity of the petitioner for indulgence, was not confined to Mr. Martin, for it seems that Catton and his agent, on more than one occasion, had conversed with Mr. Strong on the subject of the sale, and with the hope of making some satisfactory arrangement of the matter.

Mr. Strong is not a party really interested in this controversy. We find that he acted as the attorney of a commercial firm in New York, who held a debt against Wells, Adams & Stevens, amounting to about $2,500, upon which Mr. Strong had obtained a judgment in favor of his clients, for whose benefit alone he acted in this matter and purchased the mortgaged premises at the sale by their direction. They furnished the money paid for the premises, with the object of securing their claim against Wells, Adams & Stevens in some manner. At the time of the sale, Mr. Strong must have been aware of the value of the property, for we find, that immediately thereafter, he conversed with Mr. Martin as to the propriety of selling the premises if he could obtain $3,500 to $4,000 for them.

There is no charge preferred against the officer who conducted the sale ; so far as his acts are concerned, they

appear to have been proper; but if it be true, as we
are told in argument, that Mr. Strong was the only
bidder at the sale, it was the duty of the officer to
postpone the sale, in order that the property, by com-
petition in bidding, might bring a fair price. There
is no doubt, that for this purpose, it is within' the dis-
cretion of the officer to postpone the sale.

It must be conceded, that until the report of the
sale is confirmed, the whole matter is subject to the
control of the court ; and that a purchaser upon a
sale upon foreclosure of a mortgage in chancery, buys
subject to the action of the court in confirming, or set-
ting aside the sale ; and we see nothing in the statute
to which we have been referred, that curtails this pow-
er of the court. Indeed, the very words of the de-
cree under which this sale was made (and which is
the usual form of a decree of foreclosure) reserves this
control to the court. And not only before, but *after*
confirmation, from the nature and constitution of the
court, it has a complete control over the parties to the
cause, and the subject matter, and may, in a case re-
quiring its interposition, set aside a sale, and divest
any acquired rights of a purchaser ; in doing which,
however, it will take care that no injustice shall be
done to any of the parties.

In England, before the confirmation of the report,
the offer of a reasonable advance, and payment of the
expenses of the first purchaser, would be sufficient to
set aside a sale. 1 *Vesey,* 453 ; 4 *Vesey,* 700 ; 6
*Vesey,* 466–513 ; 8 *Vesey,* 214 ; *Newb. Pl.,* 168, and
the biddings may be opened more than once, when a
sufficient advance on the previous offer is made. (3
*Brown C. C.,* 475 ; 1 *Sudg. on Vend.,* 66. This
practice, however, has not been adopted in the State

of New York, for reasons which may, perhaps, equally apply with us.

The principle which has been recognized by the English courts in setting aside sales, *after confirmation of the report,* bears more directly upon the question, and is more applicable in this case.

In the case of *Watson vs. Birch,* 2 *Vesey,* 54, it was held, " as a general principle, biddings are not to be opened after confirmation of the report, *unless under particular circumstances* ; that increase of price *alone* was not sufficient, but if *fraud* appeared, it suspended the operation of the general rule," and it was also held in this case, that *fraud* was not the only possible exception. And in *Maurice vs. The Bishop of Durham,* 11 *Vesey,* 57 ; Lord Eldon held that " where there is some fraud or misconduct in the purchaser, or fraudulent negligence in another person as agent, *of which it is against conscience that the purchaser should take advantage,*" the biddings will be opened after confirmation of the report.

In the State of New York, the same principle has been acted upon, and a careful examination of the cases of this kind decided in the courts of that State, will show, that whenever it would be inequitable or against good conscience to permit the sale to stand, the court will not hesitate to exercise its discretion by ordering a resale. *Vide Lansing vs. McPherson,* 3 *John. Ch. R.* 424 ; *Williamson vs. Dale, id.* 290 ; *Collier vs. Whipple,* 13 *Wend.* 226 ; *Tripp vs. Cook,* 26 *id.* 143 ; *Regna vs. Rea,* 2 *Paige,* 339 ; *May & Filkin vs. May et al.* 11 *id.* 201.

The rule that " mere inadequacy of price is not sufficient to induce the court to open a sale," has been very zealously urged upon us. If the term *mere* could

JUNE TERM, 1853.

Strong
vs.
Catton.

be taken to be synonymous with the term *slight* there would be, we think, more justice and reason in the rule, but as it is, we admit that the New York courts have avowed, and acted upon it. If a sale be made to a *bona fide* purchaser, who perhaps has obtained the property for a price not quite adequate, but still not so much below the real value as to violate good conscience or induce a suspicion of unfairness in the transaction, here would be a case of *mere inadequacy*, which ought not to disturb the sale; but there might be a case where property worth ten thousand dollars, by the neglect of parties to attend at the sale, had been sold at one thousand dollars to some by-stander, who, knowing of the absence of the parties, availed himself of that circumstance, and with a knowledge of the value of the property, made his bid, and for want of competition, obtained the property for a ruinously low price. This is another case of *mere inadequacy*. But we must not be told, that in such case as the one last supposed, a court of conscience could be so forgetful of every dictate of. equity and morality as to refuse its interference to stay the hand of plunder. Are we asked how the purchaser in such a case has violated any rule of equity? We answer that he has sought the property of another without giving a just compensation for it. He knew the property to be worth ten times the amount which he offered, and yet he wishes to take *nine-tenths* of the property without paying to, or for the use of the owner, any equivalent whatever. In no proper sense of the word, could a transaction of this kind be called a *fair* sale. To permit such an act of injustice to be perpetrated under the sanction of a court of equity, would be a reproach to our laws and

to their administration; and with all the profound veneration which we entertain for the eminent jurists who have by their approbation *indurated* the rule of which we have been speaking, we must nevertheless, insist that *inadequacy of price* when it is so gross as to attract the attention of the court, or to induce a presumption of fraud or unfairness, or to do violence to a wholesome sense of justice, might be a sufficient reason to induce a court to set aside a sale.

Nor do we think that any consideration of policy in establishing a character of certainty and stability for such sales as these on foreclosure, ought to outweigh the pre-eminent duty of the court to frown upon and thwart whatever is opposed to justice and right. It is the settled practice of the Courts of Equity, in this country, however, to refuse a resale for *mere inadequacy of price*, and we would not be at liberty to depart from it in this case, if no other cause existed; but, taken in connection with the *surprise* generated by the conversation of the complainant in the foreclosure suit, we think it our duty to order a resale.

The appellant purchased the property in question for a sum less than one-half the medium value which has been placed upon it by the affidavits read, while he must have known that the price which he offered was not a *fair or just* one; and can we hesitate to set aside this sale when we have before us, in one of the affidavits, (that of Thomas W. Miller, who swears to the value of the premises, and also, to his own ability to pay the amount) an offer to bid and pay for the premises, on a resale, the sum of three thousand five hundred dollars.

We cannot sustain this sale without doing injustice

to the parties interested in the mortgaged premises; and by setting it aside and awarding a resale, we are not aware that injustice will be done to Mr. Strong, or those for whom he acts.

It is for the interest of the petitioner, Mr. Catton, who purchased this property *subject to the mortgage debt*, that it shall be sold for a fair price, and it is the duty of the court to protect the interests of all parties. If it was the object of the appellant, to obtain this property for such a price as would secure to his clients in the greater value of the property, something by way of indemnity for their unpaid demand against the original mortgagors, (Wells, Adams & Co.,) we cannot countenance such an object at the expense of another party in interest, who has already paid a large sum on account of the mortgage debt. To confirm this sale, would be to secure to the creditors of Wells, Adams & Co., " an unconscientious advantage" over the petitioner.

The fact that Mr. Strong has conveyed the premises, by quit-claim, to one of his clients, can make no difference in the case, for before confirmation of the report, the deed is always given subject to the jurisdiction of the court over the sale. 12 *John.* 526; 2 *Paige,* 341 ; 13 *Wend.,* 228.

In the control which a court of equity exercise over the distribution of the assets of insolvents, or of the estates of deceased persons, there can be no doubt that it would refuse its sanction to, and set aside a sale in a case where the price bid was entirely below the reasonable value of the property ; and in cases of unreasonable or " unconscionable" agreements, where the price to be given for property is either grossly

excessive, or grossly inadequate, a court of equity has either rescinded the contract on the ground of fraud, or refused to enforce a specific performance. *Vide, Osgood vs. Franklin*, 2 *Johns. Ch. R.* 23. *Clarkson vs. Hanway et. al.*, 2 *P. Wms.* 203. May not the principle of equity, upon which the court acts in such cases, be equally applicable here? It will not consummate a contract or sale in any respect *iniquitous* or " unconscionable" where, for any other cause it is authorized to interfere.

We are conscious that in this case we go farther than some of the cases warrant, but we are not conscious that we have gone farther than the plainest principles of equity lead us. A sale, under the direction of a court of equity, should not be converted into a field for speculation, but should be conducted by all parties thereto in such a manner as to bear the scrutiny of an unbiased judgment.

Let the following order be entered :

"This cause having been fully heard and understood by the court, in consideration thereof, it is *ordered, adjudged and decreed*, that the same be remanded to the Circuit Court for Walworth county, and that said Circuit Court do set aside the former sale, and order a resale of the mortgaged premises, on the condition that before such former sale be set aside, and such resale made, the petitioner, James Catton, do pay or cause to be paid to said Marshall M. Strong, the sum of one thousand seven hundred and seventy-six dollars and eighty-six cents, (being the amount bid by said Strong on the former sale of the mortgaged premises described in the petition and affidavits herein,) and interest on that sum at the rate of seven *per*

*centum per annum*, from the tenth day of July, A. D. 1852, until the time of such payment, together with the reasonable costs and expenses of said Marshall M. Strong, incurred in and about the former sale of said mortgaged premises, which costs and expenses shall be ascertained and determined in such manner as may be directed by said Circuit Court ; and said Circuit Court shall make such other and further order in the cause as may be deemed necessary to carry this decretal order into effect.

"Each of the parties shall pay the costs of this court by him respectively incurred."