COLE COUNTY *et al.* v. MADDEN *et al.*, *Appellants.*

1. **Sheriff's Sale, Bill In Equity to Set Aside:** FACTS WARRANTING RELIEF. A bill in equity filed six days after a sheriff's sale of land, under a judgment of the county court enforcing

91   585
132   458
132   463
91   585
143   178
91   585
d163   677
91   585
100a  459

a mortgage given to secure a loan of school moneys, and which seeks, before a deed is made to the purchaser, to set aside such sale, states a cause for relief in equity, if it sets out in substance that the county had made provision to have an agent at the sale to bid up the land to the amount of the debt, that the agent was not so present, and that his absence was occasioned by the sheriff, in the conduct and management of the sale, and the consequent misapprehension of the county's agent in regard thereto ; that, because of the agent's absence, the land did not bring its value, but sold for a grossly inadequate consideration, which would occasion serious loss to the school moneys involved, unless the sale should be set aside.

2. —— : ——. The finding of the issues by the trial court for the complainants, held, after an examination of the facts, to be supported by the evidence.

3. **Estoppel.** Where, in such case, the defendants, in their answer, allege that the county court had an agent present at the sale, who bid on the property, they will not be heard, on the appeal, to deny the presence of such agent, because of the failure of the county court to appoint by entry of record.

4. **Sheriff's Sale :** GROSS INADEQUACY OF PRICE, ETC. Where gross inadequacy of price is coupled with accident, mistake, or misapprehension, caused by a purchaser, or others interested in an execution sale, or by the officer conducting it, equity will interfere and set it aside.

*Appeal from Cole Circuit Court.* — HON. E. L. EDWARDS, Judge.

AFFIRMED.

*McIntyre & Wagner* for appellants.

(1) The testimony of the witnesses shows that the lot in question was worth a thousand dollars, but it fails to show any fraudulent act or purpose, or any collusion or irregularity of any kind whatever, nor is any charged in the bill. The case is entirely free from any such infirmity. Hence the court erred in setting aside the sale. The sale was open and fair, and nothing done by the sheriff or purchaser to prevent the property from selling for a higher price. Public policy would indicate that

such sales, although attended with great pecuniary loss, ought to be upheld and sustained. *Hammond v. Scott,* 12 Mo. 8; *Nelson v. Brown,* 23 Mo. 13; *Meir v. Zelle,* 31 Mo. 331; *Railroad v. Brown,* 43 Mo. 294; *Beedle v. Mead,* 81 Mo. 297, 307; *Holden v Vaughan,* 64 Mo. 588; Rorer on Jud. Sales, sec. 854; *Becknith v. Mining Co.,* 87 N. C. 155; *Bradley v. Luce,* 99 Ill. 234, 249; *Parker v. Railroad,* 44 Mo. 415, 421. (2) [a] The respondents come into a court of equity to ask relief, as we understand, upon the grounds of accident and mistake; this must be so, as no fraud was alleged and no irregularity shown. But equity does not grant relief to a party on the grounds of accident or mistake, if the accident or mistake has arisen from his own gross negligence, or want of reasonable care and attention, and especially if relief to him will harm another. *Upham v. Hamill,* 11 R. I. 565; Story's Eq. Jur. [11 Ed.] secs. 105, 146; *Penny v. Martin,* 4 Johns. Ch. 566; *Woods v. Patterson,* 4 Md. Ch. 335; *Taylor v. Fleet,* 4 Barb. [S. C.] 95; *Copehart v. M'hoon,* 5 Jones' Eq. 178; *Kesler v. Zimmerschitte,* 1 Tex. 50. (b) By the term accident is to be understood, not merely inevitable casualty, or the act of Providence, or what is technically called *vis major,* or irresistible force; but such unforeseen events, misfortunes, losses, acts, or omissions as are not the result of any negligence or misconduct in the party. Story's Eq. Jur., sec. 78. (c) The fact (about which the mistake occurs) must be material to the act—that is, must be essential to its character, and the efficient cause of the concoction, and, also, it must be such as, by the use of reasonable diligence, the party could not get knowledge of, when put upon inquiry; and if the mistake is on one side only, there must be fraudulent concealment. (d) Equity administers relief to the diligent, and puts all parties upon searching diligence. Story's Eq. Jur. [11 Ed.] secs. 141, 146, 147, 148; Kerr on Fraud and Mistake, 406, 407; *Brown v. Fagan,* 71 Mo.

563, 563. (3) The court erred in finding that the county court had an agent at said sale, within the meaning of the statute. Revised Statutes, section 7115, provides that the county court, at such sale, "may, in its discretion, * * * become, through its agent thereto duly authorized, a bidder on behalf of its county." H. A. Swift, one of the judges of the county court, testified that the county court, in session, spoke to the prosecuting attorney to attend the sale and make the property bring the amount of the school debt, that there was no record made appointing such agent. The acts of the county court can only be known by its records, and what it does must be made matter of record (R. S., sec. 1023), and by such record shown. *Dennison v. County Court*, 33 Mo. 168. They are "the only utterances of the court entitled to recognition." *Maupin v. Franklin County*, 67 Mo. 327, 330. This was such negligence on the part of the court as will not allow of equitable relief. But if we are in error in this position, and the court find that the agent was duly thereto authorized, then we contend that the agent was guilty, in law, of negligence and inattention. The evidence of the witnesses Silver, Swift, and Wagner, shows clearly that the agent was informed that the court desired him to attend the sale and make the property bring the amount of the school debt, and the agent was not misled, or, if at all, was heedlessly misled ; the county court can take no advantage of his inattention. *Parker v. Railroad*, 44 Mo. 415, 421. (4) It is charged that the sheriff's notice of sale is defective, that it does not properly recite the mortgage debt, and that it was not published for twenty days, etc. It was agreed that the notice set out at page four of the record is the notice under which the sale was made. Inspection of that notice will show that the charge is not well founded, and that the notice was all that the law requires. But if the charge were true, it would only be an irregularity, and "the purchaser is not affected by

any irregularity in the sheriff's proceedings,   *   *   *
unless he has participated in occasioning it, or there has
been some departure from the requirements of the law
for some fraudulent purpose." *Draper v. Bryson*, 17
Mo. 71, 84; *Curd v. Lackland*, 49 Mo. 451, 454; *Houck
v. Cross*, 67 Mo. 151; Rorer on Jud. Sales, sec. 589;
*Phillips v. Coffee*, 17 Ill. 154; *Wheaton v. Sexton*, 4
Wheat. 503, 506; *Maddox v. Sullivan*, 2 Rich. Eq. 4;
*Brook v. Rooney*, 11 Ga. 425.  But no irregularities
were shown, and all the presumptions are indulged in
favor of a sheriff's sale until attacked by affirmative
evidence in a direct proceeding to set it aside.  Rorer
on Jud. Sales, sec. 776; *Ferrier v. Deutchman*, 81 Ind.
390, 393.  (5) Madden was, beyond question, a *bona
fide* purchaser at this sale, without any notice whatever
of those facts and circumstances between the sheriff and
the agent which the respondents claim constitute the
grounds of their equities against such a purchaser for a
valuable consideration.  A court of equity will not inter-
fere on the grounds of accident; for, in the view of a
court of equity, such person has as high a claim to as-
sistance and protection as any other can have.  Story's
Eq. Jur., sec. 108; *Admr's of Legion v. Rogers*, 12
Ga. 281, 292.  "Every reasonable intendment should be
made in support of the rights of the purchaser at the
execution sale.  The execution was regular upon its
face, and the purchaser looked to that.  He cannot be
injuriously affected by any irregularities in the proceed-
ings which resulted in the sale, unless they were of a
character to render the proceeding wholly void," etc.
*Cabell v. Grubbs*, 48 Mo. 353, 356.  Madden's bid was
an offer to purchase, when the property was knocked
down to him.  The offer was accepted, and became a
contract and binding.  *Payne v. Cove*, 3 T. R. 148;
Parsons on Contracts [6 Ed.] sec. 480.  The purchaser
was wholly without blame; why, then, shall he not
have the benefit of his purchase, and of the contract,

which could be enforced against him? The statute de-
clares that the highest bidder, and such he was, shall be
the purchaser.

*F. M. Brown* and *Edwards & Davison* for re-
spondents.

(1) A sheriff selling property under execution is
agent of both plaintiff and defendant, and is bound to
protect the interests of both parties. *Conway v. Nolte*,
11 Mo. 74; *Shaw v. Potter*, 50 Mo. 281; *State v. Type
Foundry*, 72 Mo. 285. (2) A sheriff is not bound to
accept a bid without reserve, and if he can see that a
sacrifice of property will be prevented by a little delay,
he should return, "no sale for want of bidders." Au-
thorities *supra*. (3) While, ordinarily, inadequacy of
price is not alone sufficient cause for setting aside an
execution sale, which is, in other respects, unexcep-
tional, and when the sale is made to a *bona fide* pur-
chaser, yet when the inadequacy is such as to amount
to a badge of fraud, or, together with other circum-
stances, is such as to shock the moral sense, and partic-
ularly when surrounded by indications of hardship and
unfairness, the sale will be set aside. Rorer on Jud.
Sales [2 Ed.] secs. 1086–7; *Railroad v. Brown*, 43 Mo.
294. Here, property worth from one thousand to twelve
hundred dollars, was sold for one hundred dollars—one-
tenth of its value, or less. (4) When inadequacy of
price is combined with accident, mistake, inadvertence,
or appearances of fraud, or unfairness, the sale will be
set aside. *McKee v. Logan*, 82 Mo. 528; Rorer on Jud.
Sales [2 Ed.] sec. 1095; *Howell v. Hester*, 3 Green Ch.
[N. J.] 266. The case last cited was one in which a sub-
sequent incumbrancer was prevented by the accident, or
mistake, of her own agent from attending the sale and
bidding, and the price obtained was inadequate. The
court set aside the sale. This case is almost parallel to
the one at bar. (5) A sale will be set aside for misap-

prehension caused by the officer conducting it. Rorer on Jud. Sales [2 Ed.] sec. 566; *Lefevre v. Laraway*, 22 Barb. 173. (6) Where the property of infants is sacrificed by the neglect, fraud, or misapprehension of their guardian, they will be relieved by setting aside the sale, and by a re-sale. Rorer on Jud. Sales [2 Ed.] sec. 438; *Lefevre v. Laraway*, 22 Barb. 167. The order of re-sale in such case may be made on the court's own motion in its capacity of universal guardian of all infants, and by virtue of its obligation to exercise a general superintendence and protective jurisdiction over all their persons and property. Rorer on Jud. Sales, secs. 566, 1086; *Lefevre v. Laraway*, 22 Barb. 175; 2 Story's Eq. Jur., sec. 1334. In the case at bar the county is the trustee of the school fund, and the children of the county and the different school districts are the beneficiaries; and this case comes directly within the rules of law last above recited. (7) A sheriff's sale will be set aside for accident, mistake, or inadvertence, when shown to have operated injuriously upon the interests of the complainant. *McKee v. Logan*, 82 Mo. 528. (8) The court had full power over the execution of its process until the officer returned it, and during the return term. *Neiman v. Early*, 28 Mo. 477; *McKee v. Logan*, 82 Mo. 528; *American Wine Co. v. Scholer*, 85 Mo. 496. The sale here occurred at the May term, 1833, of the Cole circuit court, and at that term, and before any return of execution and acknowledgment of a deed by the sheriff, the petition in this case to set aside the sale was filed, and the voluntary appearance of the defendants thereto entered. (9) Equity always has jurisdiction in cases of fraud, mistake, accident, undue advantage, and the like. Freeman on Executions, sec. 309; *Rector v. Hartt*, 8 Mo. 462; *Massey v. Young*, 73 Mo. 260. (10) Where there is gross inadequacy of price, the court will seize on the slightest circumstance of irregularity, or misapprehension, to set aside the sale. *Nelson v. Brown*, 23 Mo. 21.

In addition to the mistake and misapprehension super-induced by the sheriff, whereby the county's agent was not present when the sale occurred, we have the further facts that the notice of sale failed to recite the mortgage debt; that it was published in conjunction with another notice for the sale of different property for a different debt; and, furthermore, the notice recited that the sale would be made in front of the court house, whereas the statute required it should be made at the court house door. R. S., sec. 2380. (11) The fact that H. W. Long and A. C. Scruggs were in no manner notified of a judgment against them as sureties on the school bonds, and of their absence on that account from the sale, and failure to protect their interests, was, of itself, sufficient to authorize the court to set aside the sale. *Lansing v. McPherson*, 3 Johns. Ch. 424. (12) The facts as alleged in the petition are supported by the weight of the evidence in the case. (13) The plaintiff, as well as a defendant, in an execution, can maintain a suit to set aside an execution sale for irregularity, or other cause. Rorer on Jud. Sales, sec. 1085; *Becknith v. Mining Co.*, 87 N. C. 155. The proceeding lies at the instance of the party whose rights are injuriously affected. *McKee v. Logan*, 82 Mo. 528. (14) It is true that the testimony of the defendants makes it appear that Silver was present when the land was struck off to Madden, but the testimony of Silver, Winston, Scruggs, and Gundelfinger, is to the contrary, and the attending circumstances lead to the latter conclusion. This court, even in an equity case, will defer to the finding of the trial court on disputed questions of fact. *Chapman v. McIlwrath*, 77 Mo. 38; *Chouteau v. Allen*, 70 Mo. 366; *Judy v. Bank*, 81 Mo. 404. And this rule specially applies where the evidence, as here, is entirely of an oral character.

RAY, J.—This was a proceeding in the Cole circuit

court, to set aside a sheriff's sale of certain real estate, therein mentioned. In November, 1882, as shown by the record, there was due Cole county, for the use of its general school fund, and of the several school townships, mentioned in the petition, the principal sum of eight hundred and twenty-four and one hundred and sixty-two dollars as interest thereon. This indebtedness accrued on certain school bonds, executed by Green C. Berry, as principal, and A. C. Scruggs and H. W. Long, as sureties, and was further secured by a school mortgage, in the usual form, on a part of inlot number 461, in Jefferson City. On the day, aforesaid, the county court of said county, under section 7113, Revised Statutes, 1879, made an order of sale of said real estate, under said mortgage, and delivered a copy of same to defendant, Wagner, sheriff of said county, under which the mortgaged premises, at the ensuing May term of the circuit court of said county, were sold, by said sheriff, to the defendant, Madden, at and for the sum of one hundred dollars.

The defendant, Madden, paid the one hundred dollars to the sheriff, and received from him a certificate of purchase at that price. Six days thereafter, and during the same term of said circuit court, and prior to the execution of any sheriff's deed therefor, the plaintiffs, Cole county, and Scruggs and Long, the sureties of said Berry in said school bonds, commenced this proceeding by petition in equity, in the circuit court of said county, against said sheriff and said purchaser, to set aside said sale of said mortgaged premises.

The petition alleges that the sheriff's sale to Madden was and is invalid, and ought to be so held. The reasons assigned therefor are, in substance, to the effect following: That Cole county, at the time the sale took place, had no one present to protect its interest, and that of the school funds committed to its

charge; that plaintiff had provided an agent to attend said sale, and that his absence therefrom was occasioned by defendant, Wagner, as sheriff, in the conduct and management of said sale and the consequent misapprehension of plaintiff's agent in regard thereto, brought about in the manner and under the circumstances therein stated, and fully appearing in the evidence at the trial hereinafter stated; and that, by reason thereof, the mortgaged premises were sacrificed and sold to Madden at and for a grossly inadequate price.

The answer of defendants was a general denial, except that there was a sale and that defendant, Madden, was the purchaser thereat, and then charged, affirmatively, that the county had an agent present at the sale, who bid on the property, and that if the property was sold for an inadequate price, it was solely on account of the negligence of plaintiff. The replication denied the new matter set up in the answer.

Upon the trial, the court found the issues for the plaintiff, and decreed that the sale be set aside, and that the sheriff pay back to Madden the purchase price. After unsuccessful motions for review, and in arrest, the defendants appealed to this court. At the trial it was agreed that the principal and sureties in the school bonds, for which the lot in question was sold to defendant, Madden, were all insolvent, and that Madden had never received any deed under said sale, and that none had been acknowledged by the sheriff. It also appeared in evidence, that said lot, at the time of sale, was worth from one thousand to twelve hundred or thirteen hundred dollars, one witness placing its value from one thousand to two thousand dollars. It further appeared in evidence, that, besides the lot in question, certain "*farm land*" of said Berry was also to be sold, on the same day, under a similar school mortgage, to secure other like bonds of Berry, with other sureties thereon, to the amount of one thousand dollars; that the

sureties on these bonds were perfectly solvent, but that said "farm land" was only worth about three hundred dollars, and at the sale that day made, only brought two hundred and fifty-five dollars. It is, also, conceded that the "farm land" was first offered for sale.

As to what occurred at said sales, how the same were conducted, what was done and said, by and between the sheriff and the agent of the county, during the progress thereof, in reference thereto, and whether the same occurred during the sale of the farm land, or the lot in question; and, especially, whether the plaintiff's agent was actually present at the sale of the lot in question, or bid upon the same; and if absent, whether that absence was occasioned by the sheriff in the conduct and management thereof, or by a misunderstanding or misapprehension on the part of said sheriff or agent, or both, as to what was to be done, and when done, or by whom done, the record in the cause presents a sharp and decided conflict between the testimony offered by the plaintiffs and that adduced by the defendants in that regard.

The testimony in chief for plaintiff was, in substance, as follows:

Edwin Silver, said: "In May, 1883, when lot in controversy was sold, I was prosecuting attorney of Cole county; remember the day; it was May 24; the circuit court was in session during that entire day; I was busy in the trial of an important case in court; in the morning of the day of sale the sheriff came into the court room and said, that the county court judges had instructed him to tell me to attend the sale to take place that afternoon under two school mortgage judgments in favor of the county and against Green C. Berry and others; he had, as I took them to be, executions in his hands; I looked at them and asked what the court wanted me to do, and he said bid up the debt on the property; I told him very well, but to call me when he was ready to

make the sale, and he said he would; after dinner he did call me, and I went outside of the court house, and my recollection is that he had not commenced selling the Green Berry property; I was needed in the court house, being in the trial going on, and I saw Mr. T. M. Winston, Jr., deputy clerk of the county court, and asked him if he would not stay there at the sale, as he knew more about the matter than I did, and bid on the property at the sale for me, and he said he would; I then went back into the court room, and in a very few minutes Mr. Winston came into the court room and reported that the sale of the farm land was going on, and that he had run it up to what he thought it was worth; that the securities on the school bond for that tract of land were solvent, and that the county did not want the land when the personal securities were good, and ought not to buy it in; I told him I would go out with him to the place of sale to see the sheriff, who was then crying the farm land, and I said to Wagner, in substance, what Winston had said to me, and that I did not know what to do; Wagner stopped the sale to hear what I had to say; I told him I did not know what to do, and he said 'I will go and get Joseph Stampfli,' who is, and was at the time, the presiding justice of the county court, 'and bring him up here to see'; I assented to Wagner's proposition; Wagner then stopped the sale; this was pending the sale of the farm land as I understood, and he, Wagner, started to go out of the gate; Stampfli lived one and a half blocks from the court house; I don't know whether he went to the gate or not; I immediately turned around, on Wagner's saying he would get Stampfli; next heard afterward, that the Green C. Berry property had all been sold; I don't know just what hour the property was sold; I heard of it, perhaps, an hour afterwards; I remained in the court house all the time after that, and am satisfied that Wagner knew I was in there, and engaged in the trial of a cause, being one of the

counsel in the case, and actually assisting in the trial of it ; I had no knowledge that Wagner, afterwards, proceeded with the sale ; it was my understanding that he would get Stampfli, and if he failed he would call me ; he did not say that ; I did not know that he had failed to get Stampfli until I heard the property was sold to Madden ; Wagner knew I was in the court room engaged in the trial of the *Nicholson case ;* I was not more than forty feet from the place of the sale, but inside the court room the entire time of sale of both lots, except when out as I have stated."

CROSS-EXAMINED.—" He notified me in the morning that the sale would take place, and that I was to bid it in, and make it bring the debt ; in the afternoon he notified me that he would sell, and I told T. M. Winston, the deputy clerk, to bid in the property ; I am sure Wagner suggested that he would get Stampfli ; I understood that if he failed to get Stampfli, he would again call me ; I did not understand that from what he said, but from the fact that he knew where I was, and that Stampfli was sent for to advise with me ; I do not know whether Winston bid on the lot in question or not—had bid on the land ; Winston may have told me after the sale that he bid on the property ; I don't know whether he did or not ; I did not revoke Winston's authority in express terms ; when we went out we were to call Stampfli, and talk over the matter."

Henry Dulle testified that he thought the lot worth one thousand dollars. H. A. Swift thought the lot in question worth a thousand dollars. In the spring of 1883, the question of the sale of the lot was up and the court spoke to Mr. Silver to make it bring the amount of the school debt. Cross-examined, he said there was no record appointing Mr. Silver agent for the county ; what was said to him in the spring was done in open court.

T. M. Winston testified that, in May, 1883, he was

deputy clerk of the county court; that Mr. Silver came into his office about two o'clock in the afternoon of May 24, 1883, and said that the sheriff was going to sell under the orders of the county court in the Green Berry school mortgage bonds, and Silver told him to go and make the land bring the money; he went out; Mr. Wagner was then selling, under the order of the court, the farm land described in the advertisement; Hogg, Robinson and Gordon, were securities on that note, and were perfectly solvent; did not think it advisable to buy in that land; the county did not want the land where personal security was good; bid about three hundred dollars on the farm land, as much as he thought it to be worth; went and told Silver that the securities were good, and that the county did not want the land in that case; that if he wanted anything further to come out, and he did come out and talked with Wagner and others standing there; some one suggested that Stampfli be sent for; "my recollection is that Raithel, the janitor of the court house, started for Stampfli, and got as far as the gate, twenty feet distant, when Henry Dulle stated that Stampfli was not in town, and Raithel came back; don't know who sent him; I had no further connection with the sale; went back into my office, stayed there awhile, came out, and the sheriff was crying the sale of the lot; don't remember positively whether he had just started it or not; he was reading the advertisement; I bid fifty dollars on the lot; did not bid especially for any one; I said I will give you fifty dollars to start it; it was an idle bid; would have taken it if it had been knocked off to me; my understanding is that Raithel went for Stampfli; don't remember that the sheriff went to the gate, or started to go; don't know who suggested going for Stampfli; my office was at the place of sale; Silver opened the door and gave me the papers, and said make it bring the money; I bid on the farm land all it was worth; Silver was in the court room; my connection

ceased when I told Silver to attend to it; Silver went right out with me to the place of sale when I told him I had bid on the land; I gave him back the papers; the conversation about sending for Stampfli occurred just as soon as he got out there; there were twenty or twenty-five people present; heard Dulle say that Stampfli was out of town; was in and out of my office several times; don't remember when he began to sell; he must have cried the sale of the lot fifteen or twenty minutes; he gave parties time to examine title; A. C. Scruggs was right there; I told him after the sale that he was letting the lot be sold when he could save himself; he was present during the sale and claimed that he did not know that he was on the notes; lot was knocked off between three and four o'clock; I don't know whether Silver was still outside when Dulle said Stampfli was out of town, or not; my fifty-dollar bid was after I had gone in for Silver, and after the conversation about sending for Stampfli."

H. W. Long testified that the lot was worth from one to two thousand dollars; had no notice of sale. C. J. Gundelfinger said he thought the lot was worth twelve or thirteen hundred dollars. It was admitted that Stampfli was out of town on the day of sale.

The evidence on the part of defendant was as follows:

W. W. Wagner testified: "I am sheriff of Cole county, and was on May 24, 1883; the judges of the county court told me—I cannot recall the exact day—to tell Mr. Edwin Silver to bid on the property to be sold by me under the order of that court, and that he should make it bring the debt; I promised to tell him; on the twenty-fourth of May, 1883, in the forenoon, I notified Mr. Silver that I would sell the property that day, and he said all right, to let him know when I got ready to sell, and 1 promised him I would; on the same day, after two o'clock, I could not find Silver in the court room;

went to the grand jury room and found him there; I told him I was then going to sell the Green C. Berry property, and he asked me the total of each debt; we both came down stairs and went to the court-room desk to ascertain the amounts; one was for eleven hundred and the other for nine hundred dollars; I went out then and commenced the sale; I first sold the farm land to Mr. Hogg for two hundred and fifty-five dollars; I then proceeded to sell the lot in controversy; I was just proceeding to read the advertisement for the sale of the lot when Silver told me that Tom Winston would bid for him, he being busy in court; Silver handed Winston the papers, and went into the court room; the first bid I got was fifty dollars from Tom Winston; I think Hogg bid, and it was run up to a hundred dollars by Madden; I cried it for a long time, and then I think I sent for Tom Winston, or he came out, and I said 'ain't you going to bid any more?' and he said 'no, I just wanted to start it'; and I think I told him to go and tell Silver, and tell him about the bid; and Silver came out and I told him what the bid was, and he said he did not know what to do, and asked me what the county court said; I told him again to bid the amount that was due on *it*; he said he would rather have the county court judges here, and asked me whether I would not send some one; I said I had nobody to send, and I looked around and saw old man Raithel, and told him to go down and get Stampfli, and just as he got on the rock at the gate some one said, 'Stampfli is at Liberty, and is not at home;' Raithel did not go; I then turned around and saw Silver was still standing there, and I think was speaking to T. M. Winston; I said nothing to him, and proceeded to cry the lot; Madden and Gundelfinger went into the circuit clerk's office to examine the records for some time, and when they came out, no one bidding any higher, I knocked off the property to T. B. Madden; I stated, several times, that it was a shame that the lot

was being sold for that sum; Silver was standing there when the party stated that Stampfli was out of town, and I think that he stated that I should send after Swift, the other county court judge; I told him I did not have time to run around town to hunt them up; I proceeded to cry the sale; I cried the lot fully half an hour, or more; Madden gave me the money for it, and I gave him a certificate of purchase; I did not know that Madden was going to bid; there was no bad faith on my part in conducting the sale; I did all I could to make a fair sale, and protect the county."

CROSS-EXAMINED: "I would estimate the property at a thousand dollars; I knew that when I made the sale; I sold the farm land first; Silver may have been out before, but I don't recollect it if he was; saw him only as stated in my evidence."

T. B. Madden testified: "The lot was put up for sale, and I began to inquire about it; A. C. Scruggs, one of the plaintiffs, was present, and located the lot for me; it was going cheap and I thought something was wrong about the title, and I went into the circuit clerk's office and asked him about it, and he told me it was being sold under a first mortgage, and was all right; I then bid one hundred dollars on it, and went into the clerk's office again, with Gundelfinger, and looked over the title and found it all right; I came out and waited; Wagner was crying the lot, and it was knocked off to me for one hundred dollars, and I paid for it; there were twenty-five or thirty persons present; Silver and A. C. Scruggs were present; Scruggs told me it was a good lot, and I bid on it for that reason; I heard the conversation between Silver and Wagner; Wagner sent Winston for Silver and Silver came out; Wagner asked him what he was going to do, and something was said about sending for Stampfli; I heard Dulle say that Stampfli was out of town; Silver was standing there

when the statement was made that Stampfli was out of town."

CROSS-EXAMINED: "My one hundred-dollar bid was up as much as half an hour; Winston first bid fifty dollars."

J. W. Madden testified : "Was present at sale of the lot; the sheriff was selling the farm land when I got there, and he next proceeded to sell the lot; Wagner read the advertisement and commenced the sale as soon as I got there ; Winston made a bid of fifty dollars to start it, then went with my brother into the clerk's office to look up the record ; Lusk said it was all right; we went out and my brother made the bid of one hundred dollars ; the sheriff cried the sale for some time ; sheriff sent Winston for Silver ; Silver came out and then he and Wagner talked together for some time about the sale ; they mentioned the name of Stampfli, and Raithel started toward the street ; I think Dulle or Gundelfinger stated that he was at Liberty ; Raithel came back, and Silver and Wagner again talked together ; Wagner proceeded to cry the sale ; he cried it some twenty minutes, and then he said 'sold, to T. B. Madden' ; know A. C. Scruggs ; we inquired of him about the property; he described it to us."

CROSS-EXAMINED: "Dulle and Gundelfinger were on the inside of the gate ; I think it was Dulle that said Stampfli was away; heard Wagner ask about Stampfli while Silver was there ; Silver was standing between the walls and the door ; Silver was at the sale twice, to my knowledge ; Silver handed Tom Winston the papers and I think Wagner was reading the advertisement when Silver came out; I think the farm land had been sold ; I was six or eight feet from Wagner; either Silver or Wagner asked after Stampfli ; Silver was there when it was knocked off to my brother."

W. H. Lusk testified that he was circuit clerk ; that Madden came into his office to inquire about the title to

Cole County v. Madden.

the lot while they were crying the sale—told him it was perfectly good; they were twenty or twenty-five minutes looking into the title.

Edwin Silver, recalled by plaintiff, said: " I went out to the court house door when Wagner said he was going to begin the sale; came back into court room when I made arrangement with Winston, and was not out again until Winston called me out; was only outside the two times during the sale; was out the last time but a few moments when Winston told me he had bid as much as the country land was worth; I went out at once; when I got to outside door of court house, saw Wagner standing a little distance to the left of the door; going out I approached him, telling what Winston said about the country lands; that the securities were good; that Winston had bid it up to its value; that I did not know just what to do; Wagner had been crying the sale and stopped when I said the above; it was then suggested to send for Stampfli, and it is my recollection that Wagner proposed it; I assented to it, and it was understood that Stampfli should be sent for to advise with me as to bidding more on the land than Winston had bid; Wagner started as if to go himself for Stampfli; I turned around and went back into the court room and heard no more of the matter until I heard the sale had been made to Madden for the lot, at one hundred dollars; I think now that I do remember of Raithel being sent for Stampfli, but did not hear him recalled or hear any one say that Stampfli was at Liberty; I left under the impression that Stampfli was in the city, and would be brought to the court house where I could confer with him before the sale should be proceeded with; the testimony of Wagner that he told me that Winston had bid fifty dollars on the lot, and that he (Wagner) insisted on my bidding more, is wholly untrue; I remember distinctly what occurred when I was outside of the court house, and know that what Wagner says as to my being

present when he was crying. that lot off, and of my re-
fusal to bid, is incorrect; it is impossible for it to have
occurred; I recollect what did occur while I was out
there, and know the above did not occur; I know that I
would not have permitted the lot to have sold for one
hundred dollars in my presence; know that there was
no fifty or one hundred-dollar bid while I was outside,
and the first I heard of either was after the sale of the
lot; Wagner never stated in my presence that it was a
shame that the lot should go for one hundred dollars;
he never told me that he would not run all over town to
hunt up county judges, but, on the contrary, exhibited
a perfect willingness to send for Stampfli; if Swift's
name was mentioned it was done when we spoke of
sending for Stampfli, but I do not remember it."

CROSS-EXAMINED: "I knew Wagner was going to
sell the lot that day; he told me so in the morning, and
after dinner, before beginning the sale; I knew there
were two of those school mortgage judgments against
G. C. Berry's property; I now think I remember of
Raithel's going or starting for Stampfli, but did not know
of his being recalled; Raithel and myself were going in
different directions, he out the gate, and I into the court
room."

A. C. Scruggs testified that he was present at the
sale of the lot; did not know he was on the school bonds
until after the sale; was there to protect the interest of
Mr. Gordon, who was surety on the bond secured by the
mortgage on the country land, the sale of which first
took place; the sheriff was crying off the lot in town
fifteen or twenty minutes; Silver told Tom Winston to
bid up the country land, and, as I understood, the lot,
also, to amount of the debts; Silver then went into the
court room, and Winston bid three hundred dollars on the
farm land; Silver came out again, and may have said
something to Wagner the second time he came out, but
I did not hear him; something was said about sending

for Stampfli ; Silver was out there the second time but a
few minutes ; did not see him while they were selling
the lot ; think the conversation about sending for Stampfli
was before the lot was sold ; heard nothing about send-
ing for Swift."

CROSS-EXAMINED.—"Was there during the sale of
the whole of it ; my best recollection is that Silver was
not there when the lot was put up ; did not advise Mad-
den to bid."

Defendant recalled Henry Dulle, who testified :
"Was present when the lot was sold ; Silver was there
when the sheriff was crying the lot ; I was not there
when the land was sold ; Winston bid fifty dollars on
the lot ; am county collector."

CROSS-EXAMINED.—"Something was said about
sending for the prosecuting attorney ; after Silver came
out, Tom Winston told him he had bid fifty dollars on
the lot ; think Silver said 'I don't know what to do' ;
some one said 'send for Stampfli' ; I said he was at Lib-
erty ; don't know whether Silver went into the court
room at once after Raithel started ; don't think sale was
stopped at all ; we were all together in the crowd ; Sil-
ver was there when I stated that Stampfli was out of
town ; it took a long time to sell the lot."

C. J. Gundelfinger, recalled by defendant, said :
"Was present at the sale of the lot ; remember that it
was sold to Madden ; Silver was present during the sale
of the lot ; Wagner sent for him ; the farm land was first
sold ; it must have taken one and one-half hours to sell
the farm land and lot ; think both were sold between
two and three and one-half o'clock ; Wagner gave me
lots of time to examine titles ; I saw Silver once ; he
came out by himself ; I know he was busy, and was ex-
cited, and was in a hurry ; heard about sending for
Stampfli ; Silver said some of the judges ought to be
present ; he went back in a few minutes ; Silver sug-
gested before going to send for Judge Stampfli ; that is

my recollection; Raithel started and got to the gate,
fifteen or twenty feet; I called him back; Silver van-
ished and was not there again; heard Winston make
fifty-dollar bid before Silver got there; the one hundred-
dollar bid, by Madden, was made after Silver left."

W. W. Wagner, recalled, said : "Mr. Silver was sent
for after Winston made the fifty-dollar bid; he was in
the court room when Winston made this bid; had no
other sales that day."

Such *in extenso* was the mass of testimony, sub-
mitted to the chancellor at the trial below; and we are
now asked to review his findings and reverse his decree,
for the reason that they are for the wrong party, and
not supported by the evidence in the cause; and for the
further reasons, that the petition failed to state a cause
of action, and that the court erred in overruling defend-
ant's motion for review and in arrest. Such, also, is
the substance of appellant's motions for review and in
arrest, filed in the court below, and here pressed upon
our attention, both by brief and argument of counsel.

There are, really, but two questions presented by
this entire record; one of fact, and the other of law.
The question of fact, controverted by the parties, it will
be seen, is whether the plaintiff's agent was absent from
the sale in question; and, if so, whether that absence
was occasioned by the means, and in the manner charged
in the petition. The question of law in dispute is, con-
ceding the facts charged to be proved, do they entitle
the plaintiff to the relief asked?

It may be conceded, in the outset, that it is utterly
impossible and would be futile to attempt to reconcile
the positive and direct contradictions between the wit-
nesses for plaintiffs, and those of defendants, except upon
the theory of mistake, in those particulars in which they
conflict with each other. It is not contended in briefs
or arguments of counsel, that there has been any wilful
misstatement of facts, or that any of the witnesses are

not trustworthy; but it is earnestly insisted, by each party, that its version of the facts is true; and it was left to the chancellor, in such circumstances, to search out and arrive at the probable truth, as best he could.

It will be observed that there is no substantial disagreement about many of the facts of the transaction. It is not disputed that the lot in question was sold at a grossly inadequate price, and practically sacrificed; that the sale of the farm land first took place, and that of the lot afterwards; that Silver was called out of the court room, pending one or the other of said sales, and held an interview with the sheriff in reference thereto; that Silver, for some reason, expressed a doubt as to his duty in the premises, and what he ought to do in regard thereto; that, to relieve him of his embarrassment, and to enable him to decide what to do, either he or Wagner suggested that Stampfli, the presiding justice of the county court, who lived close by, be sent for, to confer and advise with Silver as to said sale *then* pending, and his duty in the premises; that some one, probably Raithel, the janitor of the court house, was directed by the sheriff, and started to go for Stampfli, and got as far as the court house gate, some twenty feet distant, when some one said Stampfli was out of town, and the messenger thereupon returned; that shortly thereafter the sale, which had been temporarily suspended, was resumed; just what length of time this interview and abortive effort to procure the attendance of Stampfli lasted, does not clearly appear. One of the main controversies, however, between the parties, was whether this episode, or interview, between Silver and the sheriff, occurred pending the sale of the farm land, or the lot in question. Silver and Winston affirm, with great positiveness and distinctness, that it took place while the farm land was being sold. In this they are corroborated by the testimony of Scruggs. On the other hand, Wagner, the sheriff, and Madden, the purchaser, perhaps, with equal

confidence, assert that it occurred pending the sale of the town lot. In this they were corroborated by the other witnesses for defendants, some three or four in number.

Under such circumstances what was the chancellor to do? Was he to count the number of witnesses, all of whom are conceded to be reputable; or might he, with propriety, in connection therewith, turn to the attending facts and circumstances that are undisputed, and see what light, if any, they throw upon the vexed question? In this connection it is conceded, or not disputed, that the sureties on the bonds for the farm-land debt were perfectly solvent, while the farm land mortgaged and being sold therefor was only worth about three hundred dollars, and actually sold that day for only two hundred and fifty-five dollars, while the debt secured was one thousand dollars. It is also conceded that the sureties in the town-lot debt, as well as Berry, who was principal in both debts, were totally insolvent, while the town lot itself was worth from one thousand to twelve or thirteen hundred dollars—more than sufficient to pay that debt.

It must also be remembered that Silver had been directed by the county court, or its judges, to attend these sales and make the mortgaged premises bring their respective debts. There may be good reason why Winston and Silver might well pause and hesitate to comply strictly with the directions of the county court, and bid up the farm land to the amount of that debt, since they both knew, as the evidence shows, that that land was not worth half the debt, and that the personal sureties therein were perfectly solvent. Indeed, they would have been derelict in duty, and justly censurable, if they had done so, under the circumstances.

On the other hand, if Silver was a man of ordinary intelligence and business capacity, neither of which is questioned, there can be no reason in the world why he

should doubt as to his duty, or for a moment hesitate, to make the lot in question bring the full amount of that debt. From all the evidence, he must be presumed to know, what is not disputed, and that which all the other witnesses in the cause seem to have known, that the lot in question was well worth more than the debt, and that both the principal and sureties in that debt were all insolvent.

These facts and circumstances, it must be conceded, tend to show that the said interview between Silver and Wagner—the talk about sending for Stampfli, the temporary suspension of the sale, and the presence of Silver, spoken of by the witnesses—must have been pending the sale of the farm land, and not that of the lot in question. These facts and circumstances doubtless did not escape the observation of the chancellor, and might well weigh with him in making up his decision. It is also conceded that, on the day these sales were going on at the door of the court house, Silver was busily engaged in a trial then in progress in the court room, and for that reason requested Winston to take his place at the sale.

The facts and circumstances attending the entire transaction tend to show, with reasonable certainty, that Silver, during these sales, was not out of the court room more than twice—once when the sale was about to begin, when he handed Winston the papers, and requested him to attend the sale and bid on the lands, and immediately returned to the court room; the second time, when notified by Winston what he had done, and "that if he wanted anything further, to come out"; his stay on this occasion also appears to have been brief; after a short conference with Wagner about sending for Stampfli to advise with him, and the starting of the messenger to bring him, he seems to have hurried back to the court room, where his professional services required his presence.

It is further conceded that the sale of the lot in question, after it commenced, was pending for a considerable length of time, before it was finally concluded; in the language of one witness, "lots of time to examine the title" was given by Wagner to Madden and his friends, to enquire of the clerk, and examine the records to ascertain whether the title was all right. Madden, the purchaser, says his "one hundred-dollar bid was up as much as half an hour." The sheriff says he "cried the lot fully half an hour or more." Madden's brother said the sheriff "cried it some twenty minutes." C. G. Gundelfinger, recalled by defendant, said: "Was present at the sale of the lot; remember that it was sold to Madden; Silver was present during the sale of the lot; Wagner sent for him; the farm land was first sold; it must have taken one and one-half hours to sell the farm land and lot; think both were sold between two and three and one-half o'clock; Wagner gave me lots of time to examine titles; I saw Silver once; he came out by himself; I know he was busy, and he was excited, and he was in a hurry; heard about sending for Stampfli; Silver said some of the judges ought to be present; he went back in a few minutes; Silver suggested before going to send for Judge Stampfli; that is my recollection; Raithel started and got to the gate, fifteen or twenty feet; I called him back; Silver vanished and was not there again; heard Winston make fifty-dollar bid before Silver got there; the hundred-dollar bid by Madden was made after Silver left."

While the defendant's witnesses are quite positive that they saw Silver out of the court room and present, pending the sale of the lot, yet they all couple his presence with his said interview with Wagner, as to his doubts as to his duty about the bidding and the said suggestion of sending for Stampfli, to confer with him on that subject. If the facts and circumstances (other than the positive statements of witnesses) tend to show that said confer-

ence with Wagner must have been pending the sale of the *farm* land, they would, for the same reason, tend to show that the time they saw him ( Silver ) must also have been *pending that* sale, and not the sale of the lot. Silver's comprehensive review of what happened, and how it occurred, when recalled in rebuttal, besides being emphatic in its denials of defendant's witnesses as to his presence at the sale of the lot, appears to be in harmony, in other respects, with the attending facts and circumstances, and is as follows :

Edwin Silver, recalled by plaintiff, said : " I went out to the court house door when Wagner said he was going to begin the sale ; came back into the court room when I made arrangement with Winston, and was not out again until Winston called me out; was only outside the two times during the sale ; was out the last time but a few moments ; when Winston told me that he had bid as much as the country land was worth, I went out at once ; when I got to outside door of court house saw Wagner standing a little distance to the left of the door ; going out, I approached him, telling what Winston said about the country land ; that the securities were good ; that Winston had it bid up to its value ; that I did not know just what to do ; Wagner had been crying the sale and stopped when I said the above ; it was then suggested to send for Stampfli, and it is my recollection that Wagner proposed it; I assented to it, and it was understood that Stampfli should be sent for to advise with me as to bidding more on the land' than Winston bid ; Wagner started as if to go himself for Stampfli ; I turned around and went back into the court room and heard no more of the matter until I heard the sale had been made to Madden for the lot at one hundred dollars ; I think now that I do remember of Raithel being sent for Stampfli, but did not hear him recalled or hear any one say that Stampfli was at Liberty ; I left under the impression that Stampfli was in the city and would be

brought to the court house where I could confer with him before the sale should be proceeded with."

There is another circumstance tending to complicate the matter and further add to its grave difficulties, which requires attention at our hands, and that is found in Winston's connection with the sale of the lot in question. It is conceded that he was requested by Silver to attend the sale and bid on the lots for him. It is also conceded that, in point of fact, he was present about the time that the sale of the lot was commenced, and actually made the bid of fifty dollars on it. All the explanation of this matter is found in what Winston, himself, says about it. That part of the testimony bearing on this point, as will be seen by reference to his evidence, is to the effect following: that he "bid about three hundred dollars on the farm land, as much as he thought it was worth; went and told Silver that the sureties were good, and that the county did not want the land in that case; that if he wanted anything further, to come out; he did come out and talked with Wagner, and others standing there; * * * I had no further connection with the sale; went back into my office; stayed there awhile; came out, and the sheriff was crying the sale of the lot; don't remember positively whether he had just started it or not; he was reading the advertisement; I bid fifty dollars on the lot; did not bid especially for any one; I said I will give you fifty dollars to start it; it was an idle bid; would have taken it if it had been knocked off to me; * * * Silver opened the door and gave me the papers, and said, 'make it bring the money'; I bid on the farm land all it was worth; Silver was in the court room; my connection ceased when I told Silver to attend to it; Silver went right out with me to the place of sale, when I told him I had bid on the land; I gave him back the papers; the conversation about sending for Stampfli occurred just as soon as he got out there; my fifty-dollar bid was made after I had gone in for Sil-

ver, and after the conversation about sending for Stampfli."

In this same connection Silver, on cross-examination, said: "I did not revoke Winston's authority, in express terms, when we went out; we were to call Stampfli, and talk over the matter." This explanation and statement of Winston's is not controverted, or denied, by any of defendant's witnesses. If he is to be believed, and no effort was made to impeach him, or any other witness at the trial, it certainly tends to show that he, at least, considered his agency and connection with the sale terminated and was at an end when he told Silver, after bidding on the farm land, "that if he wanted anything further, to come out." In this connection Winston further said: "I bid on the farm land all it was worth; Silver was in the court room; my connection ceased when I told Silver to attend to it; Silver went right out with me to the place of sale when I told him I had bid on the land; I gave him back the papers." All this tends to show that thereafter Winston did not consider himself any longer the agent or representative of Silver in this transaction. He may have misapprehended both Silver's expectations and Wagner's suppositions, in that behalf; but certain it is, if he is to be believed, he was not present and bidding on the lot in question, for, and on behalf of, the county when he made the fifty-dollar bid in question.

The chancellor who tried the cause had all the witnesses before him; could see their manner and bearing, as well as hear their language; was doubtless well acquainted with all of them; and, after due consideration of the whole case, found the issues for the plaintiff, and rendered a decree accordingly. Appellants' counsel insists, with much earnestness, that the finding and decree is not supported by the evidence in the cause. After a patient examination of the entire record, and a careful consideration of the whole case, we have not

been able to agree with counsel in his estimate and value of said evidence, but, on the contrary, are of a different opinion, and so hold accordingly. So much as to the question of fact presented by the record.

The question of law, as before observed, is chiefly whether the petition and the finding of the court entitle the plaintiff, Cole county, to the relief asked and actually given. It is insisted, for appellants, first, that inadequacy of price alone is not, of itself, sufficient to set aside a sheriff's sale otherwise fair and regular, and that public policy requires that such sales should be upheld, although occasional hardships may attend them. Second, that in no case will such relief be granted where it appears that such inadequacy of price was occasioned by, or coupled with, the negligence of the party complaining, and in no way chargeable to any failure of duty on the part of the sheriff in the conduct of the sale.

As to the first point, respondents concede that, while, as a general rule, this may be true, yet, there is abundant authority for the proposition that, where gross inadequacy of price is coupled with accident, mistake, or misapprehension, caused by a purchaser, or others interested in a sale, or by the officer conducting the sale, equity will interpose and set aside the sale. Rorer on Jud. Sales [2 Ed.] secs. 549, 566, 1086, 1087, 1095 ; *American Wine Co. v. Scholer*, 85 Mo. 496 ; *Strong v. Catton*, 1 Wis. 471 ; *Lefevre v. Laraway*, 22 Barb. [N. Y.] 168 ; *Howell v. Hester*, 3 Green Ch. [N. J.] 266 ; *Beckwith v. Mining Co.*, 87 N. C. 155 ; *McKee v. Logan*, 82 Mo. 524 ; *Parker v. Railroad*, 44 Mo. 415 ; *Nelson v. Brown*, 23 Mo. 13 ; *The State ex rel. v. Moore*, 72 Mo. 285.

As to the second point, respondents say that authorities are not wanting to the effect that, where the property of infants, or trust estates, is sacrificed by the negligence of guardians or trustees, equity, in proper

cases, will interfere for their protection, and set aside sales thus improvidently made ; and, further, that, to a certain extent, officers, in selling property under execution, are treated by the law as agents for both plaintiff and defendant, and bound to protect the interests of both ; that they are not bound to accept a bid without reserve ; and that if they can see that a sacrifice of property will be prevented by delay, they may, in their discretion, return "no sale, for want of bidders," and be protected in so doing. Rorer on Jud. Sales [2 Ed.] sec. 438 ; *Lefevre v. Laraway*, 22 Barb. 168 ; 2 Story's Eq. Jur., sec. 1334 ; *Conway v. Nolte*, 11 Mo. 75 ; *Shaw v. Potter*, 50 Mo. 281 ; *State ex rel. v. Moore*, 72 Mo. 285.

In the case at bar, it will be observed in this connection, that the county, by law, is but the trustee of the school funds in question for the benefit of common schools, and the education of minors ; and that the justices of the county court are but its agents in the management and preservation of said funds for such uses and beneficiaries. It will be noted also, in the same connection, that Wagner, the sheriff conducting the sale in question, and speaking of it in his examination, said : " I stated several times that it was a shame that the lot was being sold for that sum ; I would estimate the property at a thousand dollars ; I knew that when I made the sale." These facts are only mentioned because they appear in the case, and may serve to characterize, to some extent, the nature of the property being sold, as well as the duty and discretion imposed upon the officer in the conduct and management of said sale. We will not say that it was the duty of the sheriff, with his knowledge and convictions in the premises, to have suspended the sale ; but that if he had seen proper to do so, as he might have done, his discretion, in our judgment, would have been proper

and commendable. *Conway v. Nolte*, 11 Mo. 75; *Shaw v. Potter*, 50 Mo. 281.

There is one other objection, made here for the first time, and deserving of brief notice only. It is insisted for appellants that there was no record entry by the county court of the appointment of Silver as its agent; that the court is one of record, and as such can only speak by its record, and, therefore, Silver was not its "duly authorized" agent, within the meaning of 'section 7115, Revised Statutes. Of this objection, it is sufficient to say that the defendants having alleged affirmatively, in their answer, "that the county court had an agent present; that he bid on the property," etc., will not now be heard to deny his authority to act as such in the premises. In their motion for review, the defendants again allege "that the sale was entirely fair, and made with full notice to the agent of the county." It is now too late to raise that objection, even if well taken, under the circumstances of the case.

Looking at the case, therefore, in all its aspects, we are of opinion that the objection of appellants, as to the sufficiency of the petition, and the propriety of the chancellor's finding and decree upon the evidence before him, is not well taken. We are further of the opinion, that, upon the whole case, the judgment is for the right party, and should be affirmed, and it is accordingly so ordered. All concur.